1                  IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF DELAWARE

3

4    ABCELLERA BIOLOGICS, INC., and  )
     THE UNIVERSITY OF BRITISH        )
5    COLUMBIA,                        )
                                      )
6                    Plaintiffs,      )
                                      ) C.A. No. 20-931-RGA
7    v.                               )
                                      )
8    BERKELEY LIGHTS, INC.,           )
                                      )
9                    Defendant.       )
     - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
10   ABCELLERA BIOLOGICS, INC.,       )
                                      )
11                   Plaintiff,       )
                                      ) C.A. No. 20-1116-RGA
12   v.                               )
                                      )
13   BERKELEY LIGHTS, INC.,           )
                                      )
14                   Defendant.       )
     - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
15   ABCELLERA BIOLOGICS, INC., and  )
     THE UNIVERSITY OF BRITISH        )
16   COLUMBIA,                        )
                                      )
17                   Plaintiffs,      )
                                      ) C.A. No. 20-1230-RGA
18   V.                               )
                                      )
19   BERKELEY LIGHTS, INC.,           )
                                      )
20                   Defendant.       )

21                                    Thursday, December 3, 2020
                                      2:00 p.m.
22                                    Oral Argument
                                      Videoconference
23

24   BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

25

1    APPEARANCES:

2              MORRIS NICHOLS ARSHT & TUNNELL LLP
               BY:  JACK B. BLUMENFELD, ESQUIRE
3              BY:  CAMERON CLARK ESQUIRE

4                   -and-

5              QUINN EMANUEL URQUHART & SULLIVAN, LLP
               BY:  F. DOMINIC CERRITO, ESQUIRE
6              BY:  ANGUS CHEN, ESQUIRE
               BY:  ERIC STOPS, ESQUIRE
7              BY:  CATHERINE T. MATTES, ESQUIRE

8                                   For the Plaintiffs

9              FARNAN LLP
               BY:  BRIAN FARNAN, ESQUIRE
10
                    -and-
11
               TURNER BOYD LLP
12             BY:  KAREN BOYD, ESQUIRE
               BY:  KEELEY VEGA, ESQUIRE
13
                                   For the Defendant
14
                    ***  PROCEEDINGS  ***
15

16             THE COURT:  Good afternoon.  This is Judge

17   Andrews in *AbCellera vs. Berkeley Lights,* Number 20-931,

18   20-1116 and 20-1230.

19             I see my deputy clerk on the line.  Can you hear

20   me?

21             DEPUTY CLERK:  Yes, Judge.

22             THE COURT:  And I see my court reporter on the

23   line.  Can you hear me?

24             THE REPORTER:  Yes, Judge.

25             THE COURT:  All right.  And I believe, I'm

1    guessing, plaintiff is represented by Mr. Blumenfeld?

2                MR. BLUMENFELD:  Yes, sir.

3                THE COURT:  All right.  And who's on the line

4    with you that is going to present argument for your side?

5                MR. BLUMENFELD:  I'm going to do the argument,

6    but let me introduce my co-counsel and client from

7    AbCellera, Tryn Stimart, who is in-house.  And then from

8    Quinn Emanuel, Nick Cerrito, Eric Stops, Angus Chen, and

9    Cathy Mattes.  And Cameron Clark from Morris Nichols.

10                THE COURT:  And is that the same Mr. Chen who

11   has tried a number of cases in front of me when he worked at

12   a different law firm?

13                MR. BLUMENFELD:  Yes, Your Honor.  He was at the

14   Haug Firm.

15                (Phone ringing.)

16                MR. BLUMENFELD:  I don't know --

17                THE COURT:  Okay.  Yes.  I'll do the same.

18                All right.  And for the defendant, I see

19   Mr. Farnan.  Mr. Brian Farnan, that is.  I've seen a lot

20   more of your brother lately.

21                MR. FARNAN:  Yes.  Good afternoon, Your Honor.

22                THE COURT:  And who's going to present the

23   argument for your side?

24                MR. FARNAN:  Your Honor, Karen Boyd will present

25   the argument for defendant.  And also with us is Jennifer

1  Seraphine, Keeley Vega, also from Turner Boyd.  And from

2  Berkeley Lights, we have Eric Hobbs who is the CEO.  Stuart

3  Merkadeau who is general counsel.  And George Fox who's

4  senior director of IP.

5  THE COURT:  All right.  Thank you.

6  And Ms. Boyd, nice to see you again.

7  MS. BOYD:  It is a pleasure, Your Honor.

8  THE COURT:  So Ms. Boyd, I take it it is your

9  argument here.  I don't think these arguments need to be

10  long because I think the briefing pretty much set things

11  out, but go ahead.

12  MS. BOYD:  Thank you, Judge Andrews.  There are

13  a few things that have happened since the briefing that I

14  wanted to update the Court about.  The biggest one is that a

15  third lawsuit was filed after we filed our original motion

16  to transfer.  So it's now three lawsuits, a total of 15

17  patents asserted.

18  THE COURT:  Okay.

19  MS. BOYD:  Another difference, since the

20  completion of the briefing in this matter, Berkeley Lights

21  has filed an amended counterclaim that includes inequitable

22  conduct claims.  There has -- the plaintiffs have filed a

23  motion to dismiss, and our opposition is due in a couple of

24  weeks.  Those inequitable conduct counterclaims, obviously,

25  bring into much more intense factual discovery, the patent

1    prosecution attorneys for UBC and AbCellera.

2            And also, in connection with that, we've

3    recently received a letter for the lawyers representing the

4    former patent prosecution firm of UBC.  It's a firm in

5    Northern California called Bozicevic Field & Francis.  One

6    of the two lawyers at that firm who were the primary patent

7    prosecutors on the early AbCellera patents sadly is

8    terminally ill, and so the lawyers representing that law

9    firm wanted us to know that they would be objecting to any

10   depositions.  We haven't worked out if a deposition is

11   possible or is going to be able to happen.  There is an

12   additional Bozicevic lawyer, Carol Francis, who so far as we

13   know is fine and will be likely to be a witness in this

14   case.

15           So that law firm is actually no longer

16   representing AbCellera and UBC in patent prosecution

17   matters.  Actually at the same time they were representing

18   UBC, they were also representing Berkeley Lights in patent

19   prosecution matters.  So there were some issues with that as

20   well.

21           The last, as far as a new fact that's come up,

22   is that AbCellera has acquired a company called Trianni.

23   This was announced on November 18th.  Trianni is a Northern

24   District of California company.  It's the second Northern

25   District -- it's the second company in the Northern District

1    of Northern California that AbCellera has acquired.

2              THE COURT:  Are they in the same nanotechnology

3    line of work, I take it, as you and AbCellera?

4              MS. BOYD:  Our understanding of that company is

5    actually that they are focused on the transgenic mice that

6    are used to make the cells that are then tested using the

7    technology at issue.  So we don't expect that the Trianni

8    acquisition will be directly intwined in the litigation

9    here, but it is an additional contact and connection to the

10   Northern District of California for the plaintiffs here.

11             So the facts in these cases, you know, these are

12   always intensely factual cases which makes case law tricky.

13   But there were a couple of cases that I wanted to address

14   briefly, and then any questions that you had on any of the

15   facts surrounding this.

16             THE COURT:  Let me ask one or two questions in

17   that regard.

18             MS. BOYD:  Okay.

19             THE COURT:  So is there any evidence in the

20   record that your products have either been used in Delaware

21   or sold in Delaware?

22             MS. BOYD:  So the products here are these very

23   large scientific instruments, so there have only been a few

24   several dozen sales of them.  Many of those sales, there's

25   about a dozen sales in California, sales around the world.

1    There is one sale that went to a Delaware company.

2              THE COURT:  Well, the Delaware company is not

3    exactly the same thing as in Delaware.

4              MS. BOYD:  Yeah, I apologize, Your Honor.  There

5    was one sale within the State of Delaware.

6              THE COURT:  Oh, okay.  All right.

7              And is it the case that the parties' ability to

8    conduct litigation, wherever it is, that I should assume

9    that it's relatively the same?

10             MS. BOYD:  I think that's a fair assumption.

11   Neither of the parties briefed this particular point, I

12   think because the parties are quite similarly situated.

13   Berkeley Lights has recently gone public.  This suit was

14   actually filed while they were in the process of going

15   public.

16             AbCellera is currently in the process of going

17   public.  UBC, The University of British Columbia, the second

18   plaintiff, is obviously a large research institution in

19   Western Canada.

20             THE COURT:  Right.  Okay.  All right.  I think

21   the plaintiffs said in their brief something to the effect

22   that the pending litigation in the Northern District between

23   you and, I think it's AbCellera, about some other patent, or

24   trade secrets, or something is essentially irrelevant.  And

25   at least based on what I remember reading, I thought that

1    was right.

2              Do you disagree with that?

3              MS. BOYD:  I don't.  So that case is -- there

4    are overlapping parties.  So Berkeley Lights and AbCellera

5    are both parties in that.  UBC is not a party in that.

6    There is another party called Lineage which is the other

7    Northern District of California company that was acquired by

8    AbCellera.  It is a different patent.  There are unfair

9    competition claims in that.  It's not closely overlapping,

10   to be sure.

11             THE COURT:  And my impression is from other

12   cases that I've had is that the Northern District of

13   California, their internal rules, with which I assume you're

14   pretty familiar, don't encourage assignment to the same

15   judge the way the rules in Delaware do.  So that the

16   likelihood is that if this case were transferred to

17   California, it would be completely random if it ended up

18   with the same judge who has the other case?

19             MS. BOYD:  I disagree with that a little bit.

20   So this -- because there are overlapping parties and because

21   the technology that these companies that are involved is the

22   same, there would certainly be a notice of related case that

23   would be filed.  Judge White who is the judge who is

24   assigned to the existing case would then make the decision

25   whether or not to relate the case and have them be both

1   heard in his Court.  My experience is that often the low

2   number case judge will take that, but not always.

3          THE COURT:  Okay.  All right.  So I did have

4   another question, but you've kind of already addressed that

5   in a way.  So why don't you highlight for me whatever it is

6   you want to highlight for me.

7          MS. BOYD:  Okay.  Going back to the facts, and

8   I'll get to the two cases that I want to talk about in a

9   moment, but I wanted to raise a factual issue that goes to

10  this question, this issue that these are large scientific

11  instruments.  One thing that's sort of unique or possibly,

12  you know, unique in this case is that there would be the

13  possibility of the jury actually seeing the product in

14  action, seeing the accused product in action if the case

15  were pending in the Northern District of California.

16  Berkeley Lights is about three-and-a-half miles from the

17  Oakland courthouse and in the Northern District.  And so

18  that's something that juries, you know, don't often get to

19  do, but that is something that we would certainly want to

20  explore as a possibility if the case were pending in

21  California and we were able to make that sort of field trip

22  arrangement.  It could be a very powerful piece of evidence

23  for the jury.

24          THE COURT:  So I don't necessarily know.  The

25  Northern District, I didn't think or maybe it does, does it

1    have divisions?  I mean, I'm aware of where Emeryville is

2    and I'm pretty aware of where downtown Oakland is.  If this

3    case were transferred, it would go to the Oakland set of

4    judges rather than San Jose or San Francisco?

5              MS. BOYD:  It would be randomly assigned unless

6    there was a request to go to -- you know, a request to go to

7    a particular district would be considered.  Again, Judge

8    White is -- and I'm so sorry, I am blanking on whether Judge

9    White is in San Jose or is in Oakland.  Several of the

10   judges in the Northern District of California have moved to

11   Oakland.  There's a lot more judges in Oakland now than

12   there used to be.  So that's a little bit unknown --

13             THE COURT:  Okay.

14             MS. BOYD:  -- which district it would be in.

15             THE COURT:  All right.  Okay.  Go ahead.

16             MS. BOYD:  So the two cases that I wanted to

17   address, I wanted to speak for just a moment on the primary

18   case that was relied on by the plaintiffs which is the

19   Sentient Sensors case.  And so, you know, again, these are

20   intensely factual cases, but it's useful to compare.

21             In that case, Judge Noreika declined to transfer

22   the case to California because she concluded that although

23   the defendant was headquartered in California, because it

24   was a multinational company and had thousands of employees

25   all over the world, it wasn't a local California company.

1   And she also focused on the fact that the products, the

2   accused products there had been originally designed and

3   developed in Washington rather than in California.

4   Here, our facts are that Berkeley Lights truly

5   is a Northern California case.  The products here were

6   designed and developed almost entirely in the Northern

7   District of California.  For a short period of time, there

8   was some work that was done in Oregon.  And over

9   three-quarters of the Berkeley Lights' employees, which

10  is -- there are just over 200 Berkeley Lights employees --

11  live and work in the Northern District of California.

12  There are also accusations here of copying.  So

13  AbCellera is saying that Berkeley Lights copied AbCellera,

14  and so that raises reputational issues that there are sort

15  of unique local interests in those reputational issues.  So

16  that the Hoffman-LaRoche case is an example of a situation

17  where that was considered.

18  The other case that I wanted to briefly discuss

19  is the Link-A-Media case.  Those facts are also a little

20  different than they are here.  So in that case, the Federal

21  Circuit granted a mandamus petition directing the District

22  of Delaware.

23  THE COURT:  Yeah, I'm very familiar with that

24  case.

25  MS. BOYD:  Yeah, so -- and there are

1    differences.  So here, both parties were sort of deeply

2    Northern District.  Their businesses were deeply in the

3    Northern District.

4              Here, Berkeley Lights' business is deeply in the

5    Northern District.  And the plaintiffs' business is in the

6    western part of Canada.  So much closer, much more

7    convenient according to flights and things like that to the

8    Northern District, but there is a difference with

9    Link-A-Media.

10             Those were the main things that I wanted to

11   discuss, and I'm happy to field any additional questions.

12             THE COURT:  Well, why don't I hear from

13   Mr. Blumenfeld, and we'll see whether there's a need for any

14   additional questions.  Okay?

15             MS. BOYD:  Thank you, Judge Andrews.

16             THE COURT:  Thank you.  Mr. Blumenfeld, go

17   ahead.

18             MR. BLUMENFELD:  Yes.

19             THE COURT:  Actually, okay.  Yeah, go ahead.

20             MR. BLUMENFELD:  Yeah, just to focus first on a

21   couple questions you asked Ms. Boyd.  The record on the

22   products being shipped into Delaware, it's in the reply

23   affidavit that they put in, but the record is that they've

24   sold a product.  And again, these are big systems, a product

25   in Delaware.  They've sold three in the Northern District of

1    California.  So it's not exactly overwhelmingly Northern

2    District of California from that point of view.

3              One question you asked about was the ability of

4    the parties to litigate in different places, and I would

5    like to talk about that.  And I agree with Ms. Boyd, by the

6    way.  There's not a lot of value in talking about cases

7    because all of these cases are on their facts and they're

8    different other than they have the burden, you know, to show

9    strongly that to overcome our paramount consideration of

10   choice of forum.

11             But I did want to talk a little bit about where

12   the parties are because, you know, there's no dispute that

13   the plaintiffs are not in California.  They are not in the

14   Northern District.  Yes, they just acquired a company

15   that's, I think, in everyone's view not terribly relevant to

16   the --

17             THE COURT:  But they're in Vancouver or near

18   Vancouver.

19             MR. BLUMENFELD:  Right.  They're in Vancouver,

20   so they're a thousand miles from San Francisco, and they're

21   farther from here, but they're not in either location is the

22   point.  It's not one of those cases like Link-A-Media where

23   the parties are kind of across the street from each other.

24             But I'd like to talk a little bit about Berkeley

25   because this is all from what they've told us, and that is

1    that, you know, they say primarily the design work was done

2    in California.  But some of it, they say in their papers,

3    was done in Oregon.  Some of it was done in Europe.  They do

4    work at their customers' sites.

5              The accused devices aren't made in California.

6    They're made in Oregon.  They say that in their papers,

7    also.

8              Their sales operations are all over the world,

9    and they've got a list of them in their opening papers,

10   opening brief at page 7, including in New Jersey, and

11   Pennsylvania, Massachusetts, Europe, Asia, Israel, and lots

12   of other places in the United States.  And so these are

13   method claims and there's infringement everywhere.

14             But one thing I would like to talk about that I

15   don't think --

16             THE COURT:  Wait.  All those 15 patents are all

17   method claims?

18             MR. BLUMENFELD:  I believe all of the asserted

19   claims are method claims, Your Honor.

20             THE COURT:  Oh, okay.

21             MR. BLUMENFELD:  I think -- I hope I'm not

22   misspeaking, but I think --

23             THE COURT:  No.  I saw Ms. Boyd agreeing with

24   you by shaking her head.

25             MR. BLUMENFELD:  Okay.  There's one thing I

1    would like to talk about because it didn't come up in either

2    of the papers that Berkeley filed, and it didn't come up in

3    the argument today, but the law I think in this Court is

4    pretty clear that they have to show -- because they're a

5    Delaware company, they have to show that there's some unique

6    or unexpected burden from litigating in Delaware.  That's --

7            THE COURT:  Yeah.  You know, Mr. Blumenfeld, the

8    statements of the law in these kinds of cases, you can find

9    some case somewhere that says almost anything.  And I'm

10   pretty sure, though, that if you look at the cases that I've

11   written over the years, I've never said that.

12           MR. BLUMENFELD:  That I'm sure is right, Your

13   Honor.  There are a couple other judges on the Court that

14   have.  But putting that aside whether it's a burden or not,

15   I did want to point to our answering brief, Exhibits 4 and 5

16   because I think it goes to --

17           THE COURT:  Is that the SEC filings?

18           MR. BLUMENFELD:  Well, number five is.  Yes,

19   they're SEC filings.  But I think what's important about

20   them is not that they're SEC filings or it's different types

21   of litigation, but if you look at Exhibit 4, and each of

22   these is only a couple pages, it's a dispute resolution

23   process for an agreement between Berkeley and Ginkgo related

24   to this technology.  And it provides for binding arbitration

25   in Wilmington, Delaware, but it also provides more than

1    that.   It says that the parties agree to produce documents

2    and make employees, and to the extent possible, former

3    employees available for depositions inherent and hearing

4    testimony.

5              So it's hard to understand how this Delaware

6    corporation can find it so inconvenient in this case when in

7    a contract with the dispute resolution process, they

8    included a provision saying, We will arbitrate in

9    Wilmington, Delaware.   And if requested, we'll bring our

10   documents and our witnesses to Delaware.

11             Exhibit 5 has to do with shareholder suits, and

12   that's interesting, too, because not terribly surprising

13   that a company like Berkeley would want its shareholder

14   suits to be in the Court of Chancery.   But again, it shows

15   some of the convenience that they're happy to be in the

16   Court of Chancery when they have shareholder -- excuse me.

17             THE COURT:   Well, you know, I think, you know,

18   there's one thing that's different about that which is the

19   Court of Chancery is the country's expert on Delaware law

20   applying to corporations.   Federal Courts, we're all experts

21   on patent law.

22             MR. BLUMENFELD:   Yeah.   Your Honor, certainly

23   this Court has expertise in patent law, so do other courts,

24   but there's something else in the provision because it also

25   says that if the Court of Chancery doesn't have subject

1    matter jurisdiction over a claim that the action may be

2    brought in another state or federal court sitting in the

3    State of Delaware.

4              So it's not just that they said Chancery Court.

5    They said, And if the Chancery Court is not available, the

6    litigation has to be brought in another court in Delaware,

7    including possibly your court.  And so, again, I just find

8    it a little odd for them to say it's an inconvenient place

9    for us to litigate when we've imposed on our stockholders

10   that they have to litigate in Delaware if they have a claim

11   against us.

12             And this does lead to the issue of convenience,

13   and documents, and witnesses.  And I do think with the world

14   we're living in today, where the documents get produced is

15   more or less, you know, irrelevant.  They're available

16   everywhere, and I think the Third Circuit law makes that

17   pretty clear.

18             I mean, most of the cases that you have before

19   you, the documents are coming from somewhere else, not from

20   Delaware.  So that's not at all unusual.  And we're living

21   in an electronic world, and unfortunately, in a COVID world

22   right now where witnesses are also, you know, coming to us

23   electronically, and we're just living in that world right

24   now.

25             And you know, one thing they said in their

1    briefs surprised me a little bit is that it would be

2    problematic to come to a trial in Delaware because of COVID.

3    And if we're not over COVID by the time we get to trial in

4    this case, we've got, I suppose, bigger problems than this

5    trial.

6                    But any way --

7                    THE COURT:  Yeah, I tend to share your optimism

8    that by the time this case is tried, COVID will be in the

9    rearview mirror.

10                   MR. BLUMENFELD:  Yeah.  Well, we hope so.

11                   But any way, with witnesses, I mean, we have --

12   you know, in their briefs, they didn't identify anyone.

13   They just said, Oh, there's going to be third-party

14   witnesses in the Northern District of California.  Today,

15   Ms. Boyd mentioned someone.

16                   They do have an inequitable conduct defense

17   counterclaim they put in which we've moved to dismiss.  We

18   don't think it has any legs.  But certainly there is, you

19   know, no reason to believe that there's some unavailable

20   witness if this case goes forward in Delaware.  The party

21   witnesses are going to be available, and there's just no

22   evidence that there's some critical witness who isn't going

23   to be available.

24                   THE COURT:  So Mr. Blumenfeld, one thing that

25   you said in your brief which I had trouble understanding was

1    you said, I think, it's more convenient for plaintiff to

2    litigate in Delaware than in the Northern District of

3    California.

4            Did you say that?  And if so, can you explain

5    that to me?

6            MR. BLUMENFELD:  Your Honor, if we said that, I

7    don't -- you know, I don't remember whether we said that.

8    If we said that, it was not a statement that somehow

9    Vancouver's closer to Delaware than it is to San Francisco.

10   But we do have the factor here that we chose to litigate

11   here because they're incorporated here rather than

12   litigating in Berkeley's backyard which we didn't want to

13   do.

14           So from that point of view, maybe convenience is

15   the wrong term.  But our people are going to have to travel

16   and get on a plane whether they go two-and-a-half hours or

17   five hours.  And we chose Delaware for a reason.  We think

18   there are good reasons.  We think, for reasons I just said,

19   it's not inconvenient for Berkeley.

20           The other thing Ms. Boyd pointed to was bringing

21   the equipment into the courtroom, and certainly there's ways

22   to deal with that without bringing a big piece of equipment

23   in, or if they want to bring one in, bringing one in.  But

24   I'm not sure why the jury, in order to understand the method

25   that's used, and the internal workings of the machine, and

1   the chips, and everything else, needs to see a machine live.

2   I mean, there --

3            THE COURT:  I thought this was nanotechnology.

4   Am I getting this wrong?

5            MR. BLUMENFELD:  No, I think you're right, Your

6   Honor, which means they're not going to be able to see --

7            THE COURT:  Well, no.  You can see a big piece

8   of equipment, but to say there's some little thing in there

9   that is, you know, one-tenth or one-100th of a hair --

10           MR. BLUMENFELD:  Yeah.  No, we could bring a

11   refrigerator in, and I suppose that would, you know, serve

12   the same purpose, but --

13           THE COURT:  I'm not too concerned that proximity

14   to a machine is much of a basis to rule one way or the other

15   here.

16           MR. BLUMENFELD:  And finally, I don't think we

17   have a dispute, based on Ms. Boyd's answer, that the

18   California litigation that they started really doesn't have

19   anything to do with this motion and shouldn't.  I mean, it

20   was a countersuit.  We understand that they brought it and

21   maybe why they brought it, but I don't think that it leads

22   to a transfer of our action to theirs.

23           THE COURT:  No.  Did you say the California

24   suit?  I was under the impression, but perhaps incorrectly,

25   that that suit was actually filed before the first of these.

1          Did I get the timing backwards?

2          MR. BLUMENFELD:  I'm sure Ms. Boyd will correct

3    me.  I thought not.  I thought that they filed a DJ action

4    after we had filed the first suit, but if I'm wrong about

5    that, I'm sure she will correct me.  But any way, I think --

6          THE COURT:  And I just ask that because you

7    couldn't really rely on filing a suit second, even if it was

8    on the same topic as a reason.  So I thought the whole

9    reason we were actually discussing this was because that

10   suit had been filed first, but we'll find out the answer in

11   a minute.

12          Anything else, Mr. Blumenfeld?

13          MR. BLUMENFELD:  No, I don't think so, Your

14   Honor.  I do think this is a case we were entitled to bring

15   in Delaware.  We did.  They're a Delaware company, and there

16   are good reasons it should stay in Delaware, including what

17   they've expressed as their convenience for litigating in

18   Delaware.

19          THE COURT:  Yeah.  You know, I wouldn't use the

20   word entitled like that in a sense that it, or I think you

21   mean a different word because to the extent you're saying

22   it's properly brought in Delaware, that's clear; right?

23          MR. BLUMENFELD:  Your Honor, what I was trying

24   to say is that under TC Heartland, we could bring it in

25   Delaware.

```
 1                    THE COURT:  Okay.  Properly.

 2                    MR. BLUMENFELD:  Yes, properly is a better word

 3       than entitled.

 4                    THE COURT:  Yes.  All right.

 5                    Ms. Boyd, so the question that Mr. Blumenfeld --

 6       well, at least I don't know the answer to, but maybe he has

 7       the right answer.  The suit in California, was that filed

 8       before or after the first of these suits?

 9                    MS. BOYD:  That was filed after the first of

10       these suits.

11                    THE COURT:  Oh, okay.  Well, he had the right

12       answer.  I did not.  That's helpful to know.  But maybe it

13       actually just goes to what I've more or less come to the

14       conclusion of anyhow which is that one's irrelevant.

15                    All right.  Ms. Boyd, so what about Ginkgo, and

16       Berkeley, and binding arbitration?  I think those are two

17       different things.  Maybe that's the same thing.

18                    Does that have anything to do with your

19       argument?

20                    MS. BOYD:  So under the -- it's under the Jumara

21       factors.  This is number 11.  This is public policy of the

22       forum.  And the issue of the preference of Delaware for

23       having Delaware courts resolve Delaware company disputes,

24       that is really more about the state courts.  And in

25       particular --
```

1           THE COURT:  No, no.  I understand that.  I

2    thought the Ginkgo Berkeley was not a corporate like control

3    sort of dispute.  That was some other just commercial

4    agreement.

5           MS. BOYD:  I believe it's a commercial agreement

6    between two companies that are both Delaware companies and

7    so choosing Delaware as a dispute resolution option.  And

8    there hasn't been a dispute, and there hasn't been any

9    litigation that I'm aware of in connection with that.

10          THE COURT:  No.  You don't have litigation in

11   the ones you don't plan for.

12          MS. BOYD:  Right.  So the choice of Delaware to

13   resolve a commercial dispute, again, the expertise of the

14   Delaware state courts is different from the federal issues

15   in patent cases that are, you know, across all of the

16   federal courts.

17          Here, the two reasons that Mr. Blumenfeld has

18   pointed to, and so we don't dispute that this case was

19   properly brought in this court.  There's no question that

20   there's jurisdiction and that there's venue to AbCellera and

21   UBC's choice to litigate here.  That's one of the factors

22   that is, you know, under the Jumara factors.

23          But that choice, according to the briefs by

24   AbCellera, is anchored in the jurisdiction and experience

25   with patent cases.  And there is unquestionably both

1    jurisdiction and experience with patent cases in the

2    Northern District of California as well.  So the idea that

3    you double count that in the convenience factors, the choice

4    that AbCellera did make, isn't -- you know, that double

5    counting shouldn't be part of the analysis.

6               I wanted to follow up on a couple of things.

7    First of all, I confirmed that Judge White is in Oakland.

8               And the equipment here, I hear what you're

9    saying and it makes sense, but the Berkeley Lights'

10   equipment actually has a screen on the front of it, and

11   there's a light microscope inside it.  And the actual

12   movement of the cells within the nano pen, you can watch

13   happening on the screen that's on the front of the device.

14   So you actually can see that at the nano -- it's actually --

15   I guess it is nano level.  I wanted to make sure I was using

16   the right order of magnitude.  You can see the pen and the

17   cells moving, and the light that -- the technology that

18   Berkeley Lights uses uses light to move individual cells,

19   and you can see that happening.  So again, I think it's

20   something that could be quite useful to the jury in

21   understanding this product.

22              Let's see.  I was looking at my notes to see if

23   there were other things that I wanted to respond to.  I

24   think just, you know, the bottom line here is as between the

25   Northern District of California and Delaware, it's clearly

1    more convenient in California.  There are many more

2    connections in the Northern District of California.  And the

3    only factor that weighs in favor of Delaware is the choice

4    of forum that the plaintiff has made which is always the

5    case.  That's always a factor that's in the plaintiff's

6    column on a motion to transfer.

7              THE COURT:  Okay.  All right.  Hold on a minute

8    here.  All right.  Let's see if I can resolve this.

9              So before me is defendant's motion in each of

10   these three cases requesting that I transfer venue to the

11   Northern District of California pursuant to 28 United States

12   Code Section 1404(a).  The two plaintiffs, both from British

13   Columbia, oppose the motion to transfer.  The motion is

14   fully briefed.

15             So the three complaints of the plaintiff are

16   patent infringement complaints.  One of the plaintiffs is a

17   Canadian university.  The other one, I believe, is a

18   Canadian corporation.

19             The defendant is a Delaware corporation that

20   maintains its headquarters and principal place of business

21   in Emeryville, California.  And so pursuant to Section

22   1404(a), defendant now seeks to transfer this action to the

23   Northern District of California.  I quote, "For the

24   convenience of parties and witnesses, in the interest of

25   justice, a district court may transfer any civil action to

1    any other district or division where it might have been

2    brought or to any district or division to which all parties

3    have consented." 28 U.S.C. Section 1404(a).

4              The party here, Berkeley Lights, seeking

5    transfer has the burden of establishing the need for

6    transfer, see *Jumara vs. State Farm Insurance Company*, 55

7    F.3d 873 at 879, Third Circuit 1995.

8              Unless the balance of convenience of the parties

9    was strongly in favor of defendant, the plaintiff's choice

10   of forum should prevail.  *Shutte vs. Armco Steel*

11   *Corporation*, 431, F. 2d 22 at 25, Third Circuit 1970.

12             Defendant's principal place of business is in

13   the Northern District of California; therefore, the Northern

14   District of California is a district where the action could

15   have been brought within the meaning of Section 1404(a).  I

16   must now consider the merits of defendant's argument.

17             Beyond the three enumerated factors which is

18   "convenience of parties, convenience of witnesses, or

19   interests of justice", which are listed in Section 1404(a),

20   the Third Circuit considers all relevant public and private

21   factors.  See Jumara 55 F. 3d at 879-80.

22             The private interest includes, and I quote:

23             "One, plaintiff's forum preference is manifested

24   in the original choice.

25             "Two, the defendant's preference.

1     "Three, whether the claim arose elsewhere.

2     "Four, the convenience of the parties as

3 indicated by their relative physical and financial

4 condition.

5     "Five, the convenience of the witnesses, but

6 only to the extent that the witnesses may actually be

7 unavailable for trial in one of the fora."

8     And "six, the location of books and records

9 similarly limited to the extent that the files could not be

10 produced in the alternative forum."  That's from Jumara.

11     The public interest include, and I quote:

12     "Seven, the enforceability of the judgment.

13     "Eight, practical considerations that could make

14 the trial easy, expeditious or inexpensive.

15     "Nine, the relative administrative difficulty in

16 the two fora resulting from Court congestion.

17     "Ten, the local interest in deciding local

18 controversies at home.

19     "Eleven, the public policies of the fora."

20     And "twelve, the familiarity of the trial judge

21 with the applicable state law in diversity cases. "  Also

22 from Jumara.

23     So plaintiffs' Canadian corporation and

24 university have chosen Delaware as a forum.  A plaintiff's

25 choice is normally given paramount consideration in any

1    determination of the transfer request, Shutte 431 F.2d at

2    25.

3              By paramount, I understand the Court of Appeals

4    to indicate that the plaintiff's choice is the most

5    important factor.  But beyond that, the balancing of factors

6    is going to be influenced by other factors which are related

7    to where a plaintiff is physically located, et cetera.

8    Thus, the plaintiff's choice is still the most important

9    factor when a plaintiff has a principal place of business

10   outside of Delaware or has no connection to Delaware other

11   than its choice to sue here.  But in the overall balancing,

12   while such a plaintiff's choice will still be the most

13   important factor, it will not dominate the balancing to the

14   same extent it otherwise might.  *Signal Tech LLC vs. Analog*

15   *Devices, Inc.,* 2012 Westlaw 1134723 at *2, District of

16   Delaware, April 3, 2012.

17             Here, plaintiff's, AbCellera's business is in

18   Canada, in British Columbia.  The University of British

19   Columbia is, obviously, in British Columbia, too.  Has no

20   offices or employees in Delaware.  Has essentially nothing

21   in Delaware that's relevant to having a trial in Delaware.

22   So I'm going to give plaintiff's choice paramount

23   consideration, but it doesn't carry the same weight in the

24   balancing as it would a similar decision by a company with a

25   principal place of business in Delaware or some other

1    connection to Delaware.  See *Memory Integrity, LLC vs. Intel*

2    *Corporation*, 2015 Westlaw 632026 at *3, District of

3    Delaware, February 13th, 2015 which afforded the plaintiff's

4    choice less weight in the balancing when the company did not

5    have any operations or employees in Delaware.

6         Defendant prefers the Northern District of

7    California where it maintains its principal place of

8    business.  Defendant has legitimate and rational reasons for

9    its alternative forum preference.  This factor, however, is

10   not given the same weight as the plaintiff's preference.

11   See, *Intellectual Ventures, I, LLC vs. Altera Corporation*,

12   842 F. Supp. 2d 744 at 755, District of Delaware 2012.

13        Plaintiff has mentioned that three of these

14   machines have been sold in the Northern District of

15   California versus one in Delaware suggesting perhaps that

16   the infringement claim arises nationwide because the method

17   is performed in the Northern District of California and in

18   the District of Delaware.  But the law is that, generally

19   speaking, the claim of patent infringement arises everywhere

20   the accused products are sold or used.  So plaintiff may be

21   correct or plaintiffs may be correct that infringement

22   occurs nationwide, but the Federal Circuit has said

23   infringement claims have "even deeper roots in the forum

24   where the accused products were developed."  Actually,

25   that's not the Federal Circuit.  That's the Memory Integrity

1     case at 2015 Westlaw 632026 at *3.

2          And what the Federal Circuit said in *In Re:*

3     *Hoffman-LaRoche, Inc.*, 587 F. 3d 1333 at 1338, Federal

4     Circuit 2009 was, "if there are significant connections

5     between a particular venue and the events that gave rise to

6     a suit, this factor should be weighed in that venue's

7     favor."

8          Here, Delaware has no connection to the

9     development of the accused infringing products.  Defendant's

10    machine may be made in Oregon, but pretty obviously the

11    headquarters in Emeryville are where it was developed.  And

12    so this factor slightly favors transfer as the infringing

13    product was developed in the Northern District of

14    California.

15         In assessing the convenience of the parties, the

16    Court examines the parties' physical location, the

17    associated logistical operation costs to the parties'

18    employees in traveling to Delaware as opposed to the

19    proposed transferee district for litigation purposes, and

20    the relative ability for each party to bear these costs in

21    light of its size and its financial wherewithal.

22         That's also from Memory Integrity at 2015

23    Westlaw 632026 at *4.  That's where that's from.

24         So here, defendant's headquarters are in the

25    Northern District of California, three-and-a-half miles from

1    the Oakland courthouse and not too far from the San Jose or

2    San Francisco courthouses, if that's where the cases were to

3    end up.  So litigation in Northern District of California

4    would certainly be more convenient for defendant by a long

5    shot.  As a practical matter, it's also more convenient for

6    the plaintiffs.

7              Yes, there are substantial airplane flights from

8    Vancouver to San Francisco or to Philadelphia, but the

9    flights are shorter to San Francisco by a measurable amount.

10   There's more of them.  And it is the same time zone and, you

11   know, they say it requires an hour for every difference in

12   time zone to recover from that sort of travel.  And so it's

13   more convenient in the Northern District for the plaintiffs,

14   even if that's where they would prefer not to be.  So that

15   factor favors transfer or that part of the factor.

16             The parties agree essentially that with relative

17   ability of each party to bear these costs, in light of its

18   size and financial wherewithal, is even.  But nevertheless,

19   the factor overall favors transfer.

20             I note in terms of the Northern District of

21   California that the Federal Circuit has said and that it

22   makes sense, based on my experience, the bulk of witnesses

23   usually comes from the accused infringer.  That's *In Re:*

24   *Genentech, Inc*. 566 F. 3d 1338 at 1345, Federal Circuit

25   2009.  Those people are, for the most part, located in the

1   Northern District of California.  As a practical matter, I

2   don't think there's any likelihood that anybody who resides

3   in Delaware or anywhere even nearby, including New Jersey

4   and Pennsylvania, has got any likelihood at all of being a

5   witness in this case.

6          It may be the case, I haven't really heard

7   otherwise, that the witnesses, even the ones who can't be

8   subpoenaed will, if necessary, come to Delaware if the trial

9   is in Delaware.  It's not clear to me about the non-party

10  witnesses.  It seems most of the witnesses in the case are

11  employed by one or the other of the parties.  But to the

12  extent there are any third-party witnesses, I think I recall

13  seeing that there were many inventors, it's still going to

14  be more convenient, if nothing else, for them to be in

15  California than in Delaware.

16         In terms of the books and records, I agree with

17  what Mr. Blumenfeld said, in general, which is that

18  documents can be produced anywhere.  And in this case, the

19  documents that are likely to be important are the documents

20  of the defendant which are in the Northern District of

21  California.  And so while the documents can be produced

22  pretty much anywhere, the Federal Circuit has made a point

23  of saying that you cannot ignore this factor.  That was in

24  *In Re:  Link-A-Media Devices Corporation* at 662 F. 3d. 1221

25  at 1224 Federal Circuit 2011.

1                    And I think the general trend in the District of

2       Delaware in light of instructions from the Federal Circuit

3       is to find that this factor favors transfer, but that it's

4       given minimal weight which balances the law with the

5       practical realities.  I think it was the case in the

6       briefing, and it certainly is the case that that

7       enforceability of the judgment is not an issue in the case.

8                    You know, practicalities that could make the

9       trial easy, expeditious or inexpensive favor transfer.  The

10      litigation in Delaware or litigation in San Francisco, or

11      Oakland, or San Jose, either place is going to involve

12      essentially the same kind of expenditures for the

13      plaintiffs.  But the litigation in the Bay area is certainly

14      going to be more inexpensive for the defendant as that's

15      where they're located.

16                   And overall, when we're talking about expensive

17      or inexpensive, it's kind of the net expense of everyone

18      that's involved.  So in terms of the balancing, the fact

19      that one place is cheap for one side is not -- because it's

20      not outweighed by some extra expenses to the other side,

21      that favors transfer.

22                   For the Court congestion factor, that's, in my

23      opinion, neutral.  The parties, as they usually do in these

24      kinds of cases, cited various statistics.  But the fact of

25      the matter is, I think, that both the judges in the Bay area

1    and in Delaware have a lot of work and a lot of cases, and

2    they do their best to move them along.  And I certainly

3    haven't been convinced by anything anyone has said that

4    there's some reason to say court congestion favors any

5    particular resolution here, so that's a neutral factor.

6           Defendant has said the local interest favors the

7    Northern District because of allegations of copying.  I have

8    to take that with a grain of salt, and it's kind of like

9    also the inequitable conduct.  Lots of allegations are made

10   at the beginning.  They drop out as you go along most of the

11   time.  And recently the Federal Circuit has been sort of

12   perhaps clarifying that they like the transfer motions to be

13   promptly decided.

14          And certainly, it's too early to tell whether

15   there's any actual reputational interest at stake here.  So

16   I think that's neutral.

17          Public policy factor, that's neutral.

18          Familiarity of state law in diversity cases,

19   that's neutral.

20          So I think factors two, three, four, five, six

21   and eight favor transfer.  Factor one disfavors transfer.

22          As I mentioned, the plaintiff's choice is

23   paramount, but it does not carry the same weight as it would

24   for a corporation or corporations that had some connection

25   to Delaware.  Plaintiff corporations, such as the principal

1    place of business in the state or possibly even

2    incorporation in this state.

3            So the issue is whether the balance of the

4    factors is sufficiently great enough to outweigh plaintiff's

5    choice of forum.  As I usually do when I'm thinking about

6    these, I do consider *In Re:  Link-A-Media*.

7            You know, I think Ms. Boyd aptly stated how this

8    case is different from *In Re:  Link-A-Media*.  And I guess I

9    could say that *In Re:  Link-A-Media* does not compel the

10   decision here, but I think it provides a relevant data

11   point.  And there have been other Federal Circuit decisions

12   recently which, to my mind, provide data points, too.

13           And so as Ms. Boyd said in *In Re:  Link-A-Media*,

14   plaintiff, without connection to Delaware, brought suit in

15   Delaware against the defendant incorporated in Delaware, but

16   headquartered in California.  So far are the same.

17           Federal Circuit held the district court clearly

18   abused its discretion by denying defendant's motion to

19   transfer to California.  The court, district court placed

20   far too much weight on the plaintiff's choice of forum and

21   its heavily reliance on the fact that the defendant was

22   incorporated in Delaware was similarly inappropriate.

23   That's pretty much a direct quote from the Federal Circuit.

24           You know, one can distinguish Link-A-Media

25   because even though plaintiff is not incorporated here, it

1    certainly has a fairly thin connection to the Northern

2    District of California.  But neither party has any

3    connection to Delaware other than the defendant's

4    incorporation in the state, and I don't think the

5    defendant's state of incorporation can be a dispositive fact

6    in the venue transfer analysis because that's what the

7    Federal Circuit said in *In Re:  Link-A-Media* at 1224.

8           The various factors that I enumerated together

9    tip the balance of convenience sufficiently in defendant's

10   favor, thus I think it is an appropriate exercise of

11   discretion to grant defendant's motion.  In totality, the

12   other private interest factors and the one factor, factor

13   eight, public interest factor outweigh plaintiff's forum

14   preference.  And so I'm going to enter an order transferring

15   all three of these cases to the Northern District of

16   California.

17          I would add that I don't think the defendant's

18   agreements in other cases to resolve matters, whether

19   they're corporate matters or some slightly less corporate

20   matter sort of thing, in Delaware really has any impact,

21   because after all, we're in agreement that the parties can

22   litigate here.  They have the capability.

23          And I've said this in other contexts.  What you

24   do in one case doesn't bind you to do the same thing in the

25   next case.

1          I skipped over -- Ms. Boyd brought up the patent

2     agents and the patent prosecutors.  I sort of had that on my

3     pre-argument checklist because I'm not entirely sure how

4     many patent trials I've had, though I think it's like about

5     60, and I'm pretty sure I've never had a patent prosecutor

6     or a patent agent testify at any of the 60 trials.  I say

7     pretty sure because I could have forgotten.

8          And I do understand that inequitable conduct is

9     a lot more likely to bring up that sort of issue, but again,

10    I did see that some time in the last few days the plaintiff

11    filed a motion to dismiss the inequitable conduct.  Those

12    are usually relatively, if anything, more times resolved

13    than some other kinds of motions to dismiss.  And of course,

14    without briefing, I wasn't going to start on that effort.

15         So I don't attribute any weight to the fact that

16    there might be patent prosecutors in California who, at the

17    minimum, for the one who's not terminally ill, it would be

18    inconvenient to come to Delaware.

19         I would guess I also would say, because Ms. Boyd

20    mentioned it, in the case which I think she called Sentient

21    Sensors of Judge Noreika, you know, on questions of law, I

22    usually try to be on the same page as my colleagues.  I do

23    agree that trying to use one district court decision to

24    decide how another district court decision on a

25    fact-intensive balancing sort of thing like a motion to

1    transfer, they really carry no weight.  You know, I'm pretty

2    sure that I don't even regard it in my own prior transfer

3    decisions as carrying much weight.  It's just impossible to

4    control for all the variables.

5            And so I can't say whether I would have done the

6    same thing as Judge Noreika or not on the facts of her case.

7    I just don't think it's really relevant to the facts of this

8    case.

9            So I was also thinking, because I imagine they

10   have different local rules out in California, I was also

11   thinking of dismissing without prejudice the motion to

12   dismiss the inequitable conduct counterclaims so that they

13   could be refiled in California in accord of whatever the

14   local rules are there.  I say that because it's irritating

15   to me when I get cases transferred in that have briefing

16   according to some style I'm not used to.

17           Do you have any objection to that,

18   Mr. Blumenfeld?

19           MR. BLUMENFELD:  I guess I'd like to confer with

20   my co-counsel and client, but I don't think so.  I mean, I

21   would think that as long as they have sufficient time to

22   refile using the California rules and with whomever the

23   California judge is, that I would be surprised if we would

24   have any objection to that.

25           THE COURT:  All right.  Well, can you -- because

1    the way that I understand this normally works is I enter an

2    order, but we don't actually transfer anything for ten days.

3    Can you check?  Because my preference would be to send it to

4    California without any pending motions.  Okay?

5                    MR. BLUMENFELD:  We will check and hopefully get

6    back to you tomorrow.

7                    THE COURT:  That would be great.  Anything else?

8                    MR. BLUMENFELD:  Not from the plaintiffs' side,

9    Thank you, Your Honor.

10                   MS. BOYD:  Nor from the defendant.  Thank you,

11   Judge Andrews.

12                   THE COURT:  Okay.  Well, you all have a good

13   day, and I will expect to hear something from you tomorrow,

14   Mr. Blumenfeld.

15                   Okay?  Thank you very much.  I'm going to hang

16   up now.

17                   (Everyone said, Thank you, Your Honor.)

18                   (Oral argument videoconference was concluded at

19   3:04 p.m.)

20                   I hereby certify the foregoing is a true and

21   accurate transcript from my stenographic notes in the

22   proceeding.

23                        /s/ Heather M. Triozzi
                          Certified Merit and Real-Time Reporter
24                        U.S. District Court

25